THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

---

| | |
|---|---|
| JOHN SUNDA and<br>JUDITH NAKYEJWE,<br><br>　　　Plaintiffs,<br><br>vs.<br><br>HOME PROPERTIES GARDENCREST,<br>LLC, HOME PROPERTIES, L.P., and<br>LIGHTHOUSE MANAGEMENT<br>SERVICES, LLC,<br><br>　　　Defendants. | No. 1:16-cv-10270-IT<br><br>**ORAL ARGUMENT<br>REQUESTED** |

**PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS**

**Table of Contents**

I.   FACTS ............................................................................................................... 2

II.  ARGUMENT ..................................................................................................... 3

    A.   Plaintiffs Have Stated a Valid Cause of Action under the Fair Housing Act ......... 4

        1.   The FHA Supports Claims for Hostile Housing Environments.................. 4

        2.   To State a Claim for a Hostile Housing Environment Under
the FHA Plaintiffs Need Not Allege that Defendants
Acted with Discriminatory Intent ................................................. 5

            i.   The Federal Agency Charged with Enforcing the FHA has
Interpreted the Act as Not Requiring Proof of Defendants'
Discriminatory Intent ............................................................ 5

            ii.  The Language of the FHA and its Similarities with Title VII
Confirm that No Intent is Required ...................................... 7

            iii. Requiring Discriminatory Intent Is Contrary to the Plain
Language of the Statute .................................................... 11

            iv.  Defendants' Citations Are Contrary to the Weight of Authority,
Inapplicable, and Were Decided before HUD's Guidance and
Recent Supreme Court Law ............................................... 13

    B.   Plaintiffs Have Stated a Valid Cause of Action under Mass. Gen.
Laws ch. 151B ........................................................................... 16

    C.   Plaintiffs Have Stated a Valid Cause of Action under Section 1982 and
the Mass. Equal Rights Act........................................................ 18

III. CONCLUSION ............................................................................................... 20

## Table of Authorities

### Cases

*Andover Hous. Auth. v. Shkolnik*, 443 Mass. 300 (2005) ............................................. 16

*Beliveau v. Caras*, 873 F. Supp. 1393 (C.D. Cal. 1995) ............................................... 9

*Braun v. Bolton, No 13-445-RGA*, 2013 U.S. Dist. LEXIS 63338 (D. Del. May 3, 2013) ........... 4

*Brillhart v. Sharp*, No. 4:cv-07-1121, 2008 U.S. Dist. LEXIS 55624 (M.D. Pa. July 21, 2008) ................................................................................................................. 5

*Burbank Apartments Tenant Ass'n. v. Kargman*, 474 Mass. 107 (2016) .................................... 17

*Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998)........................................... 10, 11

*Chesler v. Conroy*, No. 08-c-2679, 2008 U.S. Dist. LEXIS 80074 (N.D. Ill. Oct. 8, 2008) ........ 14

*Currier v. Nat'l Bd. of Med. Exam'r*, 462 Mass. 1 (2012)...................................... 18, 19

*DiCenso v. Cisneros*, 96 F.3d 1004 (7th Cir. 1996) .................................................. 4

*Doe v. Ore Duckworth*, No. 11-2963-C (3), 2013 U.S. Dist. LEXIS 113287 (E.D. La. Aug. 12, 2013) ................................................................................................. 4

*Dunn v. Wash. County Hosp.*, 429 F.3d 689 (7th Cir. 2005)......................................... 10

*Durrett v. Hous. Auth. of Providence*, 896 F.2d 600 (1st Cir. 1990)..............................7-8

*Egan v. Schmock*, 93 F. Supp. 2d 1090 (N.D. Cal. 2000)............................................ 19

*Elliott v. Plaza Prop., Inc.*, No. 2:08-cv-1037, 2010 U.S. Dist. LEXIS 68394 (S.D. Ohio June 18, 2010) .......................................................................................... 16

*Fahnbulleh v. GFZ Realty, LLC*, 795 F. Supp. 2d 360 (D. Md. 2011) ....................... 4, 10, 11, 14

*Francis v. Kings Park Manor, Inc.*, 91 F. Supp. 3d 420 (E.D.N.Y. 2015) ...................... 14, 15, 16

*Galdamez v. Potter*, 415 F.3d. 1015 (9th Cir. 2005) ............................................... 10

*Gebser v. Lago Vista Indep. Sch. District*, 524 U.S. 274 (1998).................................... 8

*Gladstone, Realtors v. Bellwood*, 441 U.S. 91 (1979) .............................................. 5

*Hicks v. Makaha Valley Plantation Homeowners Assoc.*, No. 14-00254-HG-BMK, 2015 U.S. Dist. LEXIS 85101 (D. Haw. June 30, 2015) ........... 4, 14

*Honce v. Vigil*, 1 F.3d 1085 (10th Cir. 1993) .............................................................. 4

*Jackson v. Birmingham Bd. of Ed.*, 544 U.S. 167 (2005) ............................................ 18

*Krieman v. Crystal Lake Apts. L.P.*,
    No. 05-C-0348, 2006 U.S. Dist. LEXIS 35379 (E. D. Ill. May 31, 2006) ............................. 14

*Lawrence v. Courtyards at Deerwood Ass'n, Inc.*,
    318 F. Supp. 2d 1133 (S.D. Fla. 2004) ................................................................... 16

*Love v. Boston Housing Authority, 18 MDLR 249, 1996 Mass. Comm. Discrim. LEXIS
    181 (Nov. 15, 1996),* ................................................................................... 17

*Martinez v. Cal. Investors XII,*
    No. 05-7608-JTL, 2007 U.S. Dist. LEXIS 103240 (C.D. Cal. Dec. 12, 2007) ................. 13, 18

*Meyer v. Holley*, 537 U.S. 280 (2003) ......................................................................... 6

*Modern Cont'l/Obayashi v. MCAD*, 445 Mass. 96 (2005) ......................................... 17

*Mogilevsky v. Keating,*
    No. 99-3656H, 2000 Mass. Super. LEXIS 83 (Mass. Super. Feb. 11, 2000) ........................ 19

*Neudecker v. Boisclair Corp.*, 351 F.3d 361 (8th Cir. 2003) .................................... 4, 13

*Pérez-Cordero v. Wal-Mart P.R., Inc.*, 656 F.3d 19 (1st Cir. 2011) ........................... 8

*Reeves v. Carrollsburg Condo. Unit Owners Ass'n,*
    No. 96-2495(RMU), 1997 U.S. Dist. LEXIS 21762 (D.D.C Dec. 18, 1997) ............... 5, 8, 13

*Rivera-Gomez v. de Castro*, 843 F.2d 631 (1st Cir. 1988) ........................................... 3

*Scott v. Garfield*, 454 Mass. 790 (2009) ..................................................................... 7

*Shaare Tefila Congregation v. Cobb*, 481 U.S. 615 (1987) ....................................... 19

*Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735 (1996) ................................................. 6

*Smith v. Mission Ass'n*, 225 F.Supp. 1293 (D.Kan. 2002) ........................................ 14

*Spavone v. Transitional Servs. of N.Y. Supportive Hous. Program,*
    No. 16-cv-1219, 2016 U.S. Dist. LEXIS 63005 (E.D.N.Y. May 12, 2016) ......................... 4

*Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*,
    135 S.Ct. 2507 (2015) ........................................................................................ 8, 11

*Thurdin v. SEI Boston, LLC*, 452 Mass. 436 (2008) ............................................... 18, 19

*Walker v. Crawford*,
No. 5:97-cv-1033, 1999 U.S. Dist. LEXIS 23945 (E.D. Ohio Sept. 15, 1999) ........................ 5

*West v. DJ Mortg. Makaha Valley Plantation Homeowners Assoc., No. 15-0397-AT,
2016 U.S. Dist. LEXIS 29303 (N.D. Ga. Feb. 19, 2016),* ..................................................... 4, 14

*Williams v. Poretsky Mgmt.*, 955 F. Supp. 490 (D. Md. 1996) ..................................................... 14

*Wilstein v. San Tropai Condo. Master Ass'n*,
No. 98-C-6211, 1999 U.S. Dist. LEXIS 7031 (N.D. Ill. Apr. 21, 1999) ................................. 14

### Statutory Authorities

29 U.S.C. § 623-(a)(2) ................................................................................................................. 12

42 U.S.C. § 2000e-2(a)(1) .............................................................................................................. 8

42 U.S.C. § 2000e-2(a)(2) ............................................................................................................ 12

Fair Housing Act, 42 U.S.C. § 3601 et seq. ................................................................... 1, 2, 3, 14

42 U.S.C. § 3604(a) ...................................................................................................................... 12

42 U.S.C. § 3604(b) ....................................................................................................................... 8

Mass. Gen. Laws. ch. 151B ..................................................................................................... 16, 19

Mass. Gen. Laws ch. 186, § 14. ................................................................................................... 7

### Rules and Regulations

24 C.F.R. § 100.7 ....................................................................................................................... 5-6

HUD, *Quid Pro Quo and Hostile Environment Harassment and Liability for Discriminatory
Housing Practices Under the Fair Housing Act*, 80 Fed. Reg. 63,720 .................................. *passim*

### Treatises

Restat 2d of Prop: Landlord & Tenant, § 17.6 (2nd 1997) ............................................................. 7

Restat 2d of Torts, § 282 (2nd 1979) ............................................................................................. 6

### Additional Authorities

Comment on HUD's Notice of Proposed Rule Making from Andrea Kramer,
Commonwealth of Mass. Civil Rights Division, Office of the Attorney General, RF-
5248-P-01 ............................................................................................................................. 9

Noah D. Zatz, Managing the Macaw: Third-Party Harassers, Accommodation, and the
    Disaggregation of Discriminatory Intent, 109 Colum. L. Rev. 1357 (2009)........................... 11

OIRA, *Executive Order Submissions Under Review*
    http://www.reginfo.gov/public/do/eoReviewSearch................................................................. 6

Regina Cahan, Comment, *Home is No Haven: An Analysis of Sexual Harassment in
    Housing*, 1987 Wis. L. Rev. 1061, 1073 (1987)...................................................................... 10

Defendants Home Properties Gardencrest, LLC, Home Properties, L.P., and Lighthouse Management Services, LLC (collectively "Defendants") frame this case as a mere squabble between neighbors—one in which they could not be expected to pick sides—but the harassment here was much worse than a simple fight over a fence or a parking spot. While tenants of the Defendants, Plaintiffs John Sunda and Judith Nakyejwe (collectively, "Plaintiffs") and their children were subjected to an ongoing campaign of racial harassment by their neighbor, also a tenant of the Defendants. Defendants had notice of the harassment, the power and obligation to address it, and instead did nothing.

Defendants argue that (i) there is no hostile housing environment claim under existing law, and (ii) that such a claim requires proof that Defendants acted with discriminatory intent, rather than merely requiring the harasser to have acted on the basis of race. While the First Circuit has not had the opportunity to address whether one can recover under the Fair Housing Act, 42 U.S.C. § 3601 *et seq.* ("FHA") for a "hostile housing environment", courts in <u>every other circuit</u> have recognized that such recovery is possible.  *See infra* at Section II(A)(1).  In doing so, courts have  noted that analogous hostile work environment claims have long been recognized under Title VII, a statute that shares both a broad remedial purpose and key language with the FHA.  *See infra at* Section II(A)(2)(ii).

Further, requiring Plaintiffs to establish that Defendants acted with discriminatory intent would be contrary to the U.S. Department of Housing and Urban Development's ("HUD") interpretation of the FHA, contravene the majority of the courts to have considered tenant-on-tenant harassment under the FHA, and create an unjustified schism between Title VII and Title VIII. *See infra* Section II(A)(2)(ii). Defendants argue such a schism is acceptable because employer liability under Title VII is based on vicarious liability, but that misstates the source of

the employer's duty under Title VII.  Further, Plaintiffs have adequately stated hostile housing environment claims under state law.

## I.    FACTS

For roughly eight years, Plaintiffs lived without incident at an apartment complex owned and managed by Defendants. *Id.* at ¶¶ 9-14. In May 2015, Defendants rented the apartment downstairs to a new tenant who began to viciously harass Plaintiffs and their children because of their race. *Id.* at ¶¶ 15, 17, 18. Among other harassment, this neighbor repeatedly called the Plaintiffs and their children "black n\*\*\*\*\*\*", "monkey babies" and "porch monkeys." *See, e.g.*, *id.* at ¶¶ 18, 20, 28. He frequently banged on the ceiling of his apartment (*i.e.*, Plaintiffs' floor), yelling racial slurs, including while the family was asleep. *Id.* at ¶ 32. On one occasion, he and two other men came to the apartment complex in the early morning hours in two trucks, pointed the headlights of the trucks towards Plaintiffs' apartment, and shouted "Wake up, n\*\*\*\*\*!" *Id.* at ¶ 53. His campaign of racial harassment left Plaintiffs in significant and profound fear for their family's safety, and frequently left the children in tears. *Id.* at ¶¶ 55, 32.

From the time of the very first incident, Plaintiffs repeatedly informed Defendants' employees and/or agents about this harassment and yet Defendants failed to adequately or appropriately address it. *Id* at ¶¶ 1, 63, 64. Instead, the family was forced to live in fear. *See, e.g.*, *id.* at ¶ 55. A police officer who had investigated the harassment, Officer Conway of the Waltham Police Department, repeatedly informed Defendants of her concerns for the family's safety and reported that she was "in fear for the residen[t] Mr. Sunda and his children ….". *Id.* at ¶¶ 36-39. Still, Defendants did nothing to remedy or address the harassment. *Id.* at ¶¶ 36-39.

Instead, Defendants first *threatened Plaintiffs*, stating that they had received "complaints"—which were unsubstantiated complaints from Plaintiffs' harasser made as part of his scheme of harassment—that Plaintiffs were loud and validating the harasser's tactic by

threatening Plaintiffs: "If another complaint is received there may be serious repercussion as it is in violation of your lease." *Id.* at ¶ 25, 26. Defendants then made a series of pretextual or ineffective efforts to relocate Plaintiffs (but not their harasser). *Id.* at ¶¶ 41, 46. Next, Defendants informed Plaintiffs that their tenancy would be terminated. *Id.* at ¶ 47. Eventually, Mr. Sunda went to court with the assistance of the police to get some protection for his family; he obtained a restraining order against the harasser, who was criminally charged. *Id.* at ¶ 56. It was not until after Mr. Sunda obtained this restraining order, and after criminal charges were brought, that Defendants took any action to terminate the harasser's tenancy. *Id.* at ¶ 65.

Even knowing that the court had found probable cause that unlawful harassment had occurred, Defendants did not reverse their decision to terminate Plaintiffs' tenancy but merely offered the ineffective and impractical solution of telling the entire family they could sleep in a *one-bedroom* apartment for the remaining weeks of their tenancy. *Id.* at ¶¶ 57, 59. When asked by Officer Conway why Defendants were also evicting Plaintiffs—the victims of harassment— Defendants' property manager informed her that "it was just easier that way." *Id*. at ¶ 58.

## II.   <u>ARGUMENT</u>

Defendants' motion should be denied with regard to all counts. Such a motion "may not" be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Rivera-Gomez v. de Castro*, 843 F.2d 631, 635 (1st Cir. 1988).  Defendants argue that no statute permits a claim for hostile housing environment and such a claim, if it does exist, requires proof of discriminatory intent by Defendants. However, as described below, such a position is directly contrary to HUD's interpretation of the FHA, analogous law under Title VII, the law from the federal majority of the courts to consider the issue, and the Commonwealth's interpretation of its own statutes. If the Court disagrees, and

3

finds either the claim does not exist or that an element of the claim is discriminatory intent by the defendants, Plaintiffs respectfully request leave to amend.

A. **Plaintiffs Have Stated a Valid Cause of Action under the Fair Housing Act**

1. *The FHA Supports Claims for Hostile Housing Environments*

While this Circuit has not had the opportunity to address the issue, the three Courts of Appeal to address the matter have all recognized that a landlord can be liable under the FHA for allowing a hostile housing environment—*i.e.*, an environment in which "offensive behavior unreasonably interferes with use and enjoyment of the premises." *Honce v. Vigil*, 1 F.3d 1085, 1089 (10th Cir. 1993). The Tenth Circuit reasoned that harassment was a form of discrimination and adopted the theories of recovery possible for workplace harassment, one of which is the hostile environment theory. *Id.* The Seventh Circuit also reached its decision by looking to Title VII (which allows claims for workplace discrimination), to the Tenth Circuit decision, and to district court decisions that recognized the theory of recovery. *DiCenso v. Cisneros*, 96 F.3d 1004, 1008 (7th Cir. 1996). The Eighth Circuit relied on the Seventh and Tenth Circuit decisions and the fact "decisions in related areas [of the law] provide the foundation for this type of claim." *Neudecker v. Boisclair Corp.*, 351 F.3d 361, 364 (8th Cir. 2003).

In addition, district courts in every other circuit have recognized that such a claim exists under the FHA. *See, e.g.*, *Spavone v. Transitional Servs. of N.Y. Supportive Hous. Program*, No. 16-cv-1219, 2016 U.S. Dist. LEXIS 63005, *1 (E.D.N.Y. May 12, 2016); *West v. DJ Mortg., LLC*, No. 1:15-cv-0397-AT, 2016 U.S. Dist. LEXIS 29303, (N.D. Ga. Feb. 19, 2016); *Hicks v. Makaha Valley Plantation Homeowners Assoc.*, No. 14-00254-HG-BMK, 2015 U.S. Dist. LEXIS 85101 (D. Haw. June 30, 2015); *Doe v. Ore Duckworth*, No. 11-2963-C(3), 2013 U.S. Dist. LEXIS 113287 (E.D. La. Aug. 12, 2013); *Braun v. Bolton*, No 13-445-RGA, 2013 U.S. Dist. LEXIS 63338 (D. Del. May 3, 2013); *Fahnbulleh v. GFZ Realty, LLC*, 795 F. Supp. 2d

360, 364 (D. Md. 2011); *Brillhart v. Sharp*, No. 4:cv-07-1121, 2008 U.S. Dist. LEXIS 55624

(M.D. Pa. July 21, 2008); *Walker v. Crawford*, No. 5:97-cv-1033, 1999 U.S. Dist. LEXIS 23945

(E.D. Ohio Sept. 15, 1999); *Reeves v. Carrollsburg Condo. Unit Owners Ass'n*, No. 96-

2495(RMU), 1997 U.S. Dist. LEXIS 21762 (D.D.C Dec. 18, 1997).[1]

> ### 2. *To State a Claim for a Hostile Housing Environment Under the FHA Plaintiffs Need Not Allege that Defendants Acted with Discriminatory Intent*

Defendants next argue that even if a hostile housing environment claim exists under the

FHA, it requires proof that the Defendant acted with discriminatory intent. Such a position

ignores HUD's interpretation of the FHA, the standard under the comparable Title VII, the fact

that the FHA does not require discriminatory intent at all, and the case law from the majority of

courts to address the issue.  While the *harasser's* actions must be based on race, there is no

requirement that plaintiffs must prove racial animus on the part of the landlord itself.

> ### i.   The Federal Agency Charged with Enforcing the FHA has Interpreted the Act as Not Requiring Proof of Defendants' Discriminatory Intent

Where HUD, the federal agency charged with enforcement of the FHA, has spoken

regarding the interpretation of the FHA and the requirements of hostile housing environment

claims, that interpretation "commands considerable deference." *Gladstone, Realtors v. Bellwood*,

441 U.S. 91, 107 (1979). Here, HUD has recently taken steps to confirm its longstanding

position that the FHA creates liability for landlords who fail to appropriately address tenant-on-

tenant racial harassment and has further made clear that such a claim does not require intent on

the part of the landlord. *See* HUD, *Quid Pro Quo and Hostile Environment Harassment and*

*Liability for Discriminatory Housing Practices under the Fair Housing Act*, 80 Fed. Reg. 63,720

(proposed Oct. 21, 2015) (to be codified at 24 C.F.R. pt. 100) ("HUD Proposed Rule") at 63,721.

---

[1] HUD has also interpreted the FHA as including a cause of action for hostile housing environment. *See infra* Section II(A)(2)(i).

On October 21, 2015, HUD proposed a rule that "codifies the traditional principle of liability, and HUD's longstanding position," stating:

> [A] person is directly liable under [the FHA] for harassment perpetuated by non-agents if the person knew or should have known of the harassment, had a duty to take prompt action to correct and end the harassment, and failed to do so or took action that he or she knew or should have known would be unsuccessful in ending the harassment.

*See* HUD Proposed Rule at 63,721, 726. As this standard makes clear, HUD does not require a defendant acted with discriminatory intent in order to be liable for a hostile housing environment claim.[2]

The comment period closed on December 21, 2015 and, on May 31, 2016, the rule was sent to the Office of Information and Regulatory Affairs ("OIRA"). It is currently in the final rule stage and is likely to become a final regulation (24 C.F.R. § 100.7) in the next few months and well within the pendency of this case. *See* OIRA, Rule details, http://www.reginfo.gov/ public/do/eAgendaViewRule?pubId=201604&RIN=2529-AA94*; OIRA, Executive Order Submissions Under Review, http://www.reginfo.gov/public/do/eoReviewSearch (select "Department of Housing and Urban Development" under Regulations under EO 12866 Review). While this Court is not yet bound to defer to HUD's interpretation, it is currently persuasive authority and such deference will be owed retroactively once the regulation is promulgated. *See Meyer v. Holley*, 537 U.S. 280, 287-88 (2003) (deferring to HUD's views as to extent of vicarious liability for another's bad acts under the FHA); *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 741 (1996) (regulatory interpretation applies even when regulation created in response to litigation in that case).

---

[2] This is consistent with general tort principles. Where defendant owes a duty to the plaintiff, no intent to cause harm is required. *See e.g.,* Restat 2d of Torts, § 282 (2nd 1979) (cause of action for negligence "excludes conduct which creates liability because of the actor's intention to invade a legally protected interest of the person injured or of a third person").

The proposed rule makes clear that landlords such as Defendants have a "duty to take prompt action" to correct and end tenant-on-tenant harassment, and that failure to do so is a form of "direct liability." *See* HUD Proposed Rule at 63,726-27.[3]

The proposed rule contemplates that this "duty" to act can be created by a lease or other contract, or by federal, state, or local laws. *Id.* at 63,727. As described in the Complaint, the lease and other documents in use by Defendants at the time of the events in question bound tenants not to disturb their neighbors' peaceful enjoyment and not to interfere or disturb the rights of other tenants, and gave Defendants the ability to stop tenants from doing so.  Dkt. 1 (Complaint) at ¶¶ 69-73. In addition to the contractual duties, Defendants owe other duties to their tenants under the warranty of habitability,[4] tenants' rights to quiet enjoyment,[5] and the common law duty to address dangerous conditions on the premise.[6]

### ii. The Language of the FHA and its Similarities with Title VII Confirm that No Intent is Required

Courts have long looked to the law under Title VII (employment) in interpreting Title VIII (the FHA). As the Supreme Court has recently reiterated, Title VII cases "provide essential background and instruction" in interpreting the FHA. *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S.Ct. 2507, 2516-18 (2015); *see also Durrett v. Hous. Auth.*

---

[3] The proposed rule also clarifies the grounds for vicarious liability, such as when the harasser is an agent of the landlord. *See id.* at 63,727. This is separate and distinct from direct liability. For example, the commentary outlines examples of "corrective actions appropriate for a housing provider to utilize to stop tenant-on-tenant harassment," while separately listing potential "corrective actions" for "[w]hen the perpetrator is an employee." *Id.* at 63,727.

[4] *See, e.g.*, *Scott v. Garfield*, 454 Mass. 790, 794 (2009).

[5] *See, e.g.*, Mass. Gen. Laws ch. 186, § 14.

[6] *See* Restat 2d of Prop: Landlord & Tenant, § 17.6 (2nd 1997); Pangas, 42 U. Tol. L. Rev. at 584-86 (describing evolution from original, common law conception of the landlord-tenant relationship as based on caveat emptor, to the modern conception in which landlords have significant duties to their tenants).

*of Providence*, 896 F.2d 600, 602 (1st Cir. 1990) (looking to Title VII case to determine Title VIII law on appealability of consent decree).

As these courts have noted, such reliance upon Title VII is logical given the similar language in and purposes of both statutes. Both statutes make it "unlawful" to "discriminate against" an individual "in the terms, conditions, or privileges" of their housing/employment "because of" the individual's race (or other protected characteristic).[7] Both statues are also broadly remedial, designed to end bias and prejudice. *See Inclusive Cmtys.*, 135 S. Ct. at 2521 ("The FHA, like Title VII and the ADEA, was enacted to eradicate discriminatory practices within a sector of our Nation's economy."); *Reeves*, 1997 U.S. Dist. LEXIS 21762, *20 ("[B]ecause Title VII and Title VIII share the same purpose--to end bias and prejudice--sexual harassment should be actionable under Title VIII."). The key difference is the forum in which the bias is being targeted: the workplace or housing.[8]

Under Title VII, it has long been settled law that an employee can prevail on a claim for a hostile work environment without a showing of intentional discrimination by the employer. *Pérez-Cordero v. Wal-Mart P.R., Inc.*, 656 F.3d 19, 27-30 (1st Cir. 2011) (reviewing cases). Rather, the employee need only show that he or she was harassed based on membership in a

---

[7] 42 U.S.C. § 3604(b) reads:

> [I]t shall be **unlawful**—
> (b) To **discriminate against** any person **in the terms, conditions, or privileges** of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, **because of race, color, religion, sex, familial status, or national origin** (emphasis added).

And 42 U.S.C. § 2000e-2(a)(1) states:

> It shall be an **unlawful** employment practice for an employer—
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to **discriminate against** any individual with respect to his compensation, **terms, conditions, or privileges** of employment, **because of such individual's race, color, religion, sex, or national origin** (emphasis added).

[8] This common purpose distinguishes Title VII and Title VIII from Title IX. Title IX is Spending Clause statute and thus only purports to end discrimination by recipients of federal funding, whereas Titles VII and VIII seek to eradicate discrimination from their entire sectors. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286-87 (1998) (distinguishing Title IX from Title VII on this basis).

protected class, that the employer had notice of such harassment, and that the employer failed to

adequately address the harassment. Specifically, an employee must prove:

> (1) that he is a member of a protected class;

> (2) that he was subjected to unwelcome sexual harassment;

> (3) that the harassment was based upon sex;

> (4) that the harassment was sufficiently severe or pervasive so as to alter the
> conditions of his employment and create an abusive work environment;

> (5) that sexually objectionable conduct was both objectively and subjectively
> offensive, such that a reasonable person would find it hostile or abusive and that
> he in fact did perceive it to be so; and

> (6) that some basis for employer liability has been demonstrated.

*Id.* at 27. As numerous courts have found, these same principles apply in the Title VIII context as

well. *See supra* at 4, 7-8.

In fact, as courts and HUD have both recognized, tenants are perhaps even more affected

by racial harassment than employees.  As HUD has stated, "One's home is a place of privacy,

security, and refuge (or should be), and harassment that occurs in or around one's home can be

far more intrusive, violative, and threatening than harassment in the more public environment of

one's work place." *See* HUD Proposed Rule, 80 Fed. Reg. 63,722; *see also* Comment on HUD's

Notice of Proposed Rule Making from Andrea Kramer, Comm. of Mass. Civil Rights Div.,

Office of the Attorney General, RF-5248-P-01, available at https://www.regulations.gov/#!

documentDetail;D=HUD-2015-0095-0023 ("Mass. AG Letter") at 3 ("As HUD acknowledged,

harassment in housing can be more impactful and invasive than harassment in employment

because one's home is supposed to be a safe haven."); *Beliveau v. Caras*, 873 F. Supp. 1393,

1397 n.1 (C.D. Cal. 1995) ("'When sexual harassment occurs at work, at that moment or at the

end of the work day, the woman may remove herself from the offensive environment. She will

choose whether to resign from her position based on economic and personal considerations. In contrast, when the harassment occurs in a woman's home, it is a complete invasion in her life. Ideally, home is the haven from the troubles of the day. When home is not a safe place, a woman may feel distressed and, often, immobile.'" (quoting Regina Cahan, Comment, *Home is No Haven: An Analysis of Sexual Harassment in Housing*, 1987 Wis. L. Rev. 1061, 1073 (1987))).

Defendants ignore the multitude of cases that look to Title VII in interpreting Title VIII and instead argue that landlord-tenant relationships are distinguishable from employer-employee relationships. *See* Dkt. 23 (Defs' Memo) at 6-7. While it is correct that employers are sometimes liable for workplace harassment on agency theories (*i.e.* when liability is based on vicarious liability), an employer's liability is not so limited. Rather, as the Supreme Court cases cited by Defendants themselves note, an employer is also directly liable for its own conduct where it fails to adequately respond to harassment in the workplace. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 759 (1998) ("An employer is negligent with respect to sexual harassment if it knew or should have known about the conduct and failed to stop it."); *see also Galdamez v. Potter*, 415 F.3d. 1015, 1022 (9th Cir. 2005) (the "hostile environment theory of employer liability is grounded in negligence and ratification rather than intentional discrimination"). Indeed, even where the harasser is a person *beyond its control* (*e.g.* third parties such as customers), an employer may be liable under Title VII. *See, e.g.*, *Dunn v. Wash. County Hosp.*, 429 F.3d 689, 691 (7th Cir. 2005) ("[T]he employer's responsibility is to provide its employees with nondiscriminatory working conditions. The genesis of inequality matters not; what does matter is how the employer handles the problem."); *Fahnbulleh*, 795 F. Supp. 2d at 364 ("However, employer liability under Title VII is not limited to harassment perpetrated by employees.

10

Employers can also be liable for the harassing conduct of a third party.").[9] Such liability is not dependent on agency theories; the harassers are not agents of the employers and employers have no control over those harassers. An employer's liability therefore does not stem from control over its employees.[10]

Given that courts often look to Title VII cases to interpret Title VIII, that such reliance is consistent with the language and purposes of the statutes, and such an analogy is proper because an employer's liability does not stem from control over the harasser, the Court should look to Title VII in this instance and not require plaintiffs to prove discriminatory intent by defendants. "To hold otherwise would be to introduce an unjustified discrepancy between Title VII and Title VIII theories of harassment and discrimination." *Fahnbulleh*, 795 F. Supp. 2d at 364.

> iii. Requiring Discriminatory Intent Is Contrary to the Plain Language of the Statute

The Supreme Court recently rejected the argument that an FHA claim can only be brought against one who intentionally discriminates. In *Inclusive Communities*, the Court addressed whether disparate impact claims were valid under the FHA. In arguing against the existence of such claims, the Texas Department of Housing and Community Affairs ("the Department")—like Defendants here—focused on the portion of the FHA making it unlawful "to

---

[9] Although Defendants state that "many" courts have held that, despite having the power to evict, landlords do not exert enough control over tenants to have liability for tenant-on-tenant harassment, they cite only a decision of the New York trial court. *See* Dkt. 23 (Defs' Memo) at 7.

[10] As the Supreme Court has repeatedly stated, while agency law may be relevant in interpreting Title VII, "common-law principles may not be transferable in all their particulars to Title VII." *Burlington*, 524 U.S. at 754. Commentators have noted that the law on workplace harassment may be seen as akin to the law on reasonable accommodation. *See* Noah D. Zatz, *Managing the Macaw: Third-Party Harassers, Accommodation, and the Disaggregation of Discriminatory Intent*, 109 Colum. L. Rev. 1357, 1386 (2009) ("[T]hird-party harasser claims possess the same basic elements as a claim for denial of reasonable accommodation under the ADA."). When informed that an employee needs a reasonable accommodation under the ADA, the employer must accommodate the employee or face liability; when an employee is harassed, the employer must take steps to protect the employee—regardless of the source of the harassment—or face liability. *Id.* at 1386-87.

refuse to sell or rent after the making of a bona fide offer, . . . or otherwise make unavailable or deny, a dwelling to any person *because of race*." 42 U.S.C. § 3604(a) (emphasis added). *See Inclusive Cmtys.* at 2519. The Department argued this language foreclosed disparate-impact liability because "a[n] action is not taken 'because of race' unless race is a *reason* for the action." *Id.* at 2519 (citing Department's Brief) (emphasis in original). The Supreme Court explicitly rejected this argument, holding that "because of race" does not equate to an intent requirement. *Id.* As the Supreme Court noted, this identical language appears both in Title VII and the ADEA, and the Court had already ruled in those contexts that no intent requirement existed under those statutes: "Both Title VII and the ADEA contain identical 'because of' language, see *42 U. S. C. §2000e-2(a)(2)*; *29 U. S. C. §623(a)(2)*, and the Court nonetheless held those statutes impose disparate-impact liability." *Id.* Thus, disparate impact claims are valid under the FHA and do not require intent on the part of the defendant.

The same analysis applies here. "[B]ecause of race" in the FHA does not mean that the defendant must act with racial animus. Rather, the *harasser* must have acted on the basis of race, such that the hostile environment was "because of race."[11] Under this plain language, as definitely interpreted by the Supreme Court, Plaintiffs need not plead discriminatory intent on the part of the Defendants. To hold otherwise would be to create an inexplicable schism between two theories of recovery under the FHA: disparate impact and hostile housing environment.

---

[11]This distinguishes hostile housing environment claims under the FHA from claims not tied to a protected characteristic. Plaintiffs could not, for example, bring an FHA claim based on Defendants' failure to address another tenant's loud behavior or drug dealing.

    iv. <u>Defendants' Citations Are Contrary to the Weight of Authority,
       Inapplicable, and Were Decided before HUD's Guidance and Recent
       Supreme Court Law</u>

The overwhelming majority of courts to consider such cases have determined that,

analogous to a hostile work environment claim under Title VII, a plaintiff does not need to prove

the defendant acted with discriminatory intent to establish a hostile housing environment claim

under the FHA. For example, in *Neudecker*, the Eighth Circuit held defendants liable for failing

to address harassment from other tenants. 351 F.3d at 365. Defendants try to distinguish this case

because some of the harassing tenants were children of the management team. Dkt. 23 (Defs'

Memo) at 5-6. However, the court (i) did not limit defendants' liability to the actions of those

children, (ii) certainly found no agency relationship existed between those children and the

defendants, and (iii) actually implied an agency relationship was not required: "[w]hile

Neudecker does not allege [defendant's] agents themselves harassed him, he does allege that

tenants—including children of Boisclair's management team—constantly harassed and

threatened him based on his disability." 351 F.3d at 365.

In *Martinez v. Cal. Investors XII*, No. 05-7608-JTL, 2007 U.S. Dist. LEXIS 103240

(C.D. Cal. Dec. 12, 2007), the plaintiffs alleged a pattern of racial harassment by their neighbors.

*Id.* at *3-4. Defendants argued that their motion for judgment on the pleadings should be granted

because "plaintiffs ha[d] not alleged that defendants intentionally discriminated against

plaintiffs." *Id.* at *16. The court disagreed and denied the motion, emphasizing that the "FHA

must be interpreted broadly." *Id.* at *26-27.

Likewise, in *Reeves*, the plaintiff homeowner alleged another resident racially and

sexually harassed her and the defendant failed to take action. 1997 U.S. Dist. LEXIS 21762 at

*3-4. The court outlined the elements of a *prima facie* case for hostile housing environment and

did not include discriminatory intent by the defendants; it was sufficient that the harassment was

based on protected characteristics. *Id.* at \*23. *See also Wilstein v. San Tropai Condo. Master Ass'n*, No. 98-C-6211, 1999 U.S. Dist. LEXIS 7031, \*32 (N.D. Ill. Apr. 21, 1999) (holding plaintiff adequately stated a claim where he "claim[ed] certain individuals, particularly other residents of the complex, repeatedly and systematically harassed, insulted and otherwise tormented him at his place of residence" and "also allege[d] the [defendant] was aware of this harassment"); *Hicks*, 2015 U.S. Dist. LEXIS 85101 at \*32 (holding plaintiffs sufficiently stated a claim where they "allege[d] that the residents in Unit 37B engaged in racially discriminatory conduct against Plaintiffs, and that the Defendants knew of this conduct, but that Defendants failed to follow the CC&Rs and House Rules or to otherwise assist them or take any remedial action."); *Fahnbulleh*, 795 F. Supp. 2d at 363-64 (analogizing to Title VII and holding that landlords may be held liable for tenant-on-tenant harassment).[12]

In the face of the weight of this authority, Defendants cite only three district court decisions. *See* Dkt. 23 (Defs' Memo) at 5. Only one of those three reach the actual issue, and it is wrongly decided and currently on appeal.

Defendants primarily rely upon *Francis v. Kings Park Manor, Inc.*, 91 F. Supp. 3d 420 (E.D.N.Y. 2015), a lone district court case in which the court found discriminatory intent was an element of a hostile housing environment claim. However, this decision is contrary to the weight

---

[12] Further, even in those cases featuring harassment by a landlord or landlord's agent, many courts have listed the elements of a hostile housing environment claim and not included discriminatory intent by the defendant. *See e.g. Chesler v. Conroy*, No. 08-c-2679, 2008 U.S. Dist. LEXIS 80074, \*7-8 (N.D. Ill. Oct. 8, 2008) (stating elements and requiring only that harassment be unwelcome, based on sex, pervasive or severe, and "defendants knew or should have known of the harassment in question and failed to take prompt remedial action"). *See also West v. DJ Mortg.*, LLC, No. 1:15-cv-0397-AT, 2016 U.S. Dist. LEXIS 29303, (N.D. Ga. Feb. 19, 2016) (listing elements and not including defendant's intent); *Krieman v. Crystal Lake Apts. L.P.*, No. 05-C-0348, 2006 U.S. Dist. LEXIS 35379 (E. D. Ill. May 31, 2006) (same); *Smith v. Mission Ass'n*, 225 F.Supp. 1293, 1299 (D.Kan. 2002) (same); *Williams v. Poretsky Mgmt.*, 955 F. Supp. 490, 497 (D. Md. 1996) (same).

of authority and unpersuasive in its reasoning. It is also currently on appeal.[13] Moreover, it was decided before the Supreme Court's decision in *Inclusive Communities* and before HUD issued its proposed rule recognizing and confirming the existence of a hostile housing environment claim.

The reasoning of the *Francis* court suffers from two key defects. First, the court side-stepped the argument that disparate impact claims do not require intent, so the FHA as a whole cannot be read to always require intent. The court questioned whether disparate impact claims even exist by noting that "the viability of such a claim is set to be resolved by the Supreme Court this term. *Id.* at 433 (citing *Inclusive Cmtys.*, 135 S. Ct. 46, 189 L. Ed. 2d 896 (2014) (granting writ of certiorari)). As discussed above, *see infra* Section II(A)(2)(iii), that case has since been decided and the Supreme Court confirmed that disparate impact claims are valid under the FHA and do not require discriminatory intent. *Inclusive Cmtys.*, 135 S.Ct. 2507. Second, parting ways with the Seventh, Eighth and Tenth Circuits and numerous other district courts, the court in *Francis* dismissed analogies to Title VII because, in its view, Title VII relies on agency theories not applicable to case of tenant-on-tenant harassment. 91 F. Supp. 3d at 431. As noted above, however, this reasoning represents a fundamental misunderstanding of Title VII liability. An employer may be vicariously liable under Title VII for the actions of an employee that is an agent of the employer, but the employer may also be directly liable for its own actions in failing to remedy known harassment. The *Francis* court even acknowledged that employers may be liable for harassment from third parties over which they have no control, without ever reconciling that firmly-established principle with its apparent theory that employer liability can only be predicated on an agency relationship. *Id.* at 431. *See infra* Section II(A)(2)(ii).

_____

[13] The appeal has been fully briefed and the Second Circuit heard oral argument on April 7, 2016. *See Francis v. Kings Park Manor, Inc.*, No. 15-1823 (2d Cir.).

The two other cases cited by Defendants are even less helpful to their argument. In *Elliott v. Plaza Prop., Inc.*, No. 2:08-cv-1037, 2010 U.S. Dist. LEXIS 68394, (S.D. Ohio June 18, 2010), the court did not foreclose a claim for tenant-on-tenant harassment, without intent from the defendant; it merely held that such plaintiff had not adequately stated such a claim in that particular case. *Id.* at *17-18.[14] Finally, Defendants rely upon *Lawrence v. Courtyards at Deerwood Ass'n, Inc.*, 318 F. Supp. 2d 1133, 1146-1149 (S.D. Fla. 2004), but cite pages of the decision concerned with recovery under separate sections of the FHA. In this case, Defendants' FHA challenge is limited to Count I, which seeks recovery under Section 3604. In *Lawrence*, the court did not address the viability of hostile housing environment claims under Section 3604. Instead, it found Section 3604 did not apply on other grounds. *See id.* at 1142-43. Where it does discuss hostile housing environment claims, it arrives at the same erroneous conclusion about agency and Title VII as did the court in *Francis*. *See id.* at 1148-49.

## B.  <u>Plaintiffs Have Stated a Valid Cause of Action under Mass. Gen. Laws ch. 151B</u>

Because Plaintiffs have stated a claim under the FHA, they have also stated a claim under Mass. Gen. Laws ch. 151B § 4(6) (Count IV). As Defendants concede, Massachusetts courts have long held that cases interpreting the FHA are persuasive in interpreting the state law counterpart "unless we discern a reason to depart from those decisions." *Andover Hous. Auth. v. Shkolnik*, 443 Mass. 300, 306 (2005); *see also* Dkt. 23 (Defs' Memo) at 9-10. Here, there is no reason for divergent interpretations, as it is equally clear that Chapter 151B permits hostile housing environment claims and does not require proof of defendants' discriminatory intent.

---

[14] Indeed, the court acknowledged the Eighth Circuit's recognition of such a claim, but held only that "a comment made between tenants outside of [plaintiff's] presence cannot constitute the type of harassment that is sufficiently severe or pervasive to deprive [him] of [the] right to enjoy [his] home as required by this type of theory, and as recognized by *Neudecker*." *Elliott*, 2010 U.S. Dist. LEXIS 68394 at *17-18 (internal quotation omitted). By contrast, in this case, the harassment endured by the Sunda family was egregious and ongoing.

In addition, just as hostile work environment claims have been found actionable under

Title VII, so in Massachusetts have such claims been upheld in the employment context. *See*

*Modern Cont'l/Obayashi v. MCAD*, 445 Mass. 96 (2005). Again, as under federal law, this offers

persuasive evidence of an analogous hostile housing environment cause of action under state

anti-discrimination law.[15] *See Burbank Apartments Tenant Ass'n. v. Kargman*, 474 Mass. 107,

121 (2016) (looking to employment discrimination protections under 151B to interpret housing

discrimination protections and noting shared purpose of such protections: "to eradicate

discrimination in all its forms").

Moreover, both the state agency charged with investigating and prosecuting state housing

discrimination laws and the Massachusetts Attorney General have supported this position.

In *Love v. Boston Housing Authority*, 18 MDLR 249, 1996 Mass. Comm. Discrim.

LEXIS 181 (Nov. 15, 1996), the Massachusetts Commission on Discrimination awarded

$100,000 in damages to a tenant who endured racial harassment from neighbors because the

housing authority refused to investigate his claims of harassment or transfer him. The

Commission explained that, under Massachusetts law, "[r]espondent BHA is liable for the racial

harassment if it failed to take adequate steps to remedy the situation." *Id.* at *12.

---

[15] Defendants attempt to distinguish *Modern* because the court relied upon an MCAD guideline that said employers could be liable for harassment by non-employees, and no analogous guidance exists here. *See* Dkt. 23 (Defs' Memo) at 9-10. However, this argument ignores the AGO's recent explanation of state law on tenant-on-tenant harassment, *see* Mass. AG Letter, and the other rationales underlying the decision in *Modern*. The court in *Modern* also based its holding on an analogy to federal law. The court concluded that "an employer who is not part of the solution inevitably becomes part of the problem," so:

> An employer who passively tolerates the creation of a hostile working environment implicitly ratifies the perpetrator's misconduct and thereby encourages the perpetrator to persist in such misconduct, whatever the employer's precise legal relationship to the perpetrator. Moreover, acquiescence on the part of the employer effectively communicates to the victim of harassment that her employer does not care about the hostile environment in which she must work, a message that can only operate to exacerbate the adverse effects of that hostile environment.

445 Mass. at 105. This logic is equally applicable to tenant-on-tenant harassment cases.

The Attorney General's Office ("AGO"), in writing in support of the HUD Proposed Rule, confirmed that Massachusetts law reaches the type of discrimination at issue in this case. The AGO wrote that "[o]ur state laws, like federal law, prohibit housing providers and professionals from engaging in discrimination, including harassment, and obligate them to work to ensure prompt remediation of discrimination once informed of it." Mass. AG Letter at 1. The AGO stated that "landlords have an obligation to ensure tenants' rights to quiet enjoyment and . . . they generally have the right to take actions against renters and occupants who disturb the quiet enjoyment of others." *Id.* at 2. The AGO endorsed the Proposed Rule and did not call for any modification of the rule to require discriminatory intent on behalf of the landlord. As such, it is clear that the AGO supports the claim for hostile housing environment and believes that the claim exists under Massachusetts law.

### C. Plaintiffs Have Stated a Valid Cause of Action under Section 1982 and the Mass. Equal Rights Act

Section 1982 and the Massachusetts Equal Rights Act (Mass. Gen. Laws ch. 93, § 102) ("MERA") encompass both Plaintiffs' claims for hostile housing environment and for retaliation. *See Jackson v. Birmingham Bd. of Ed.,* 544 U.S. 167, 176 (2005) (Section 1982 covers retaliation claims); *Thurdin v. SEI Boston, LLC*, 452 Mass. 436, 440 (2008) (MERA "drew on language" of Section 1982); *Currier*, 462 Mass. at 14 (looking to federal law, including Section 1982, to interpret MERA). Even if this Court were to find there is no cause of action for hostile housing environment claims under these statutes for Defendants' allowance of a hostile housing environment—which it should not—the retaliation claims would still survive.

Further, neither statue requires that "Defendants acted out of racial animus." Dkt. 23 (Defs' Memo) at 8. As described above, racially-motivated conduct in a hostile housing environment claim is by the harasser, not the defendant. *See Martinez*, 2007 U.S. Dist. LEXIS

103240 at *27-29 (plaintiffs sufficiently plead claim under Section 1982 where they alleged defendants "ratified or acquiesced in the harassment and intimidation of the Martinez family" and did not require allegations that "defendant intended to discriminate on the basis of race"). Further, the analysis under Section 1982 should mirror that under FHA, *Egan v. Schmock*, 93 F. Supp. 2d 1090, 1093 (N.D. Cal. 2000), and, as described above, the FHA does not require a showing of intent by the defendant.

Moreover, MERA arguably provides greater protections than Section 1982 because, *inter alia*, it provides equality in more areas (e.g. guaranteeing "the full and equal benefit of all laws") and is specifically designed not to be duplicative of other theories of recovery. *See Mogilevsky v. Keating*, No. 99-3656H, 2000 Mass. Super. LEXIS 83, *21-22 (Mass. Super. Feb. 11, 2000) (because statute provides a remedy "except as otherwise provided or permitted by law" it is not duplicative of claims under other statutes). Even if this Court were to reject a hostile housing environment claim exists under Chapter 151B, or find that the claim requires Defendants to act with intent, MERA should act as the civil rights back-up/catch-all its language suggests it to be. *See id* at *22 (allowing claim to proceed where plaintiff had a "unique situation," which fell outside of ch. 151B). *Cf. Thurdin v. SEI Boston, LLC*, 452 Mass. 436, 445 (2008) (stating "there is nothing in the plain language of G. L. c. 151B stating that, where it does not apply, aggrieved parties are excluded from using other statutes to vindicate their right to be free from employment discrimination" and finding party precluded under ch. 151B could proceed under MERA).

Defendants cite only two cases in support of their proposition that intent is required under these statues: *Shaare Tefila Congregation v. Cobb*, 481 U.S. 615 (1987) and *Currier v. Nat'l Bd. of Med. Exam'r*, 462 Mass. 1 (2012). In *Shaare Tefila*, the Court's holding was limited to whether harassment against Jews was covered under Section 1982. *Id.* at 617. The court stated

19

the racial animus held by defendants was sufficient to state a cause of action, but did not rule out the possibility that the animus might be held by a different actor and that defendants could be liable for failing to address that harassment. *Id.* Likewise, *Currier* states the discrimination must be "purposeful" but does state that the discriminatory intent must be possessed by the defendant, as opposed to by the harasser. *Id.* at 14-15.

## III.    CONCLUSION

Wherefore, Plaintiffs request the Court deny Defendants' Motion for Judgment on the Pleadings and allow them to pursue their claims for hostile housing environment, without requiring proof of discriminatory intent by Defendants. To the extent the Court disagrees, Plaintiffs seek permission to amend their complaint to address any deficiencies.

### Request for Oral Argument

Pursuant to Local Rule 7.1(d), Plaintiffs hereby requests oral argument on Defendants' motion and the foregoing opposition.


Respectfully submitted,

JOHN SUNDA and JUDITH NAKYEJWE,

By their attorneys,

/s/ Catherine C. Deneke
Catherine C. Deneke (BBO #673871)         Oren M. Sellstrom (BBO #569045)
cdeneke@foleyhoag.com                     osellstrom@lawyerscom.org
Michael Hoven (BBO #688593)               LAWYERS' COMMITTEE FOR CIVIL RIGHTS
mhoven@foleyhoag.com                      AND ECONOMIC JUSTICE
FOLEY HOAG LLP                            294 Washington Street, Suite 443
155 Seaport Boulevard                     Boston, MA 02108
Boston, MA 02210-2600                     (617) 988-0608
(617) 832-1000

Dated: June 14, 2016

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 14th day of June, 2016, the foregoing document was served via CM/ECF on all registered parties.

_/s/ Catherine C. Deneke_____
Catherine C. Deneke